In re WESTERN BANK & TRUST CO. et al.

(District Court, N. D. Texas. June 20, 1908.)

No. 716.

1. CORPORATIONS — EFFECT OF ATTEMPTED AMENDMENT OF CHARTER — TEXAS STATUTE CONSTRUED.

Rev. St. Tex. 1895, art. 647, provides that any corporation incorporated by special act which would be authorized to incorporate under the provisions of such title may, like corporations organized thereunder, amend its articles of incorporation as therein provided. Article 664 provides that "any corporation heretofore organized and now in existence under any general or special law * * * may by a vote of its directors accept any or all of the provisions of this title, * * * whereupon that portion of its charter inconsistent with this title, or the portion accepted shall cease to be applicable to such corporation." Prior to the enactment of such statute a corporation had been chartered by special act having both banking and trading privileges. Under such statute and the state Constitution adopted after its charter, a corporation could not be formed for two distinct purposes nor with banking privileges. Such corporation, without having accepted any of the provisions of such title as provided in article 664, attempted to amend its charter, under article 647, by changing its name and principal place of business. *Held*, that it was not within the class of corporations given the right of amendment by such article, but that, if it be held by its attempted exercise of such right to have accepted a "portion" of the title, under article 664, its charter right to conduct a banking business was not inconsistent with such portion, and that in continuing such business under the name and at the place stated in the amendment it acted as a corporation de facto, and its stockholders cannot be held liable as partners.

2. SAME—CORPORATE EXISTENCE AND FRANCHISE—REISSUE OF STOCK.

Where a corporation, after changing its name, retired its old stock in the new name, the fact that, during a short interval while the change was being effected, there was no stock outstanding, did not affect the validity of its corporate franchise.

3. SAME — LIABILITY OF STOCKHOLDERS FOR CORPORATE DEBTS — ESTOPPEL OF CREDITORS TO DENY CORPORATE EXISTENCE.

Where an association for years conducted a banking business as a corporation in the belief that it was legally incorporated, issuing stock which was purchased by the stockholders in good faith and in the bona fide belief that it was a corporation, persons who dealt with it as such are estopped to deny that it was a corporation and to charge such stockholders with liability as partners.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 83–91.]

In Bankruptcy. On petition in involuntary bankruptcy.

Etheridge & McCormick, for petitioning creditors.

Davis & Meador, for intervening creditors.

M. M. Crane, Locke & Locke, Coke, Miller & Coke, Murphy Townsend, W. A. Kemp, Henry Jackson, U. F. Short, W. J. McKie, Gregory, Batts & Brooks, Hogg, Gill & Jones, M. B. Templeton, Terry, Cavin & Mills, C. K. Bell, Finley, Knight & Harris, Whitehurst & Whitehurst, W. W. Wilkinson, and John Spellman, for respondents.

MEEK, District Judge. It is sought in this involuntary proceeding to have the Western Bank & Trust Company decreed a partnership,

and as such to have it and the members thereof adjudged bankrupt. This concern, as a corporation, has been engaged in a general banking business at Dallas, Tex. In the exercise of corporate functions it issued and there is now outstanding all of the shares of the capital stock of $500,000. Shares of this stock were held by approximately 70 persons, whose residences are scattered throughout the United states. It is sought to have these shareholders held to be members and copartners in the business of the Western Bank & Trust Company and to fix upon them a partnership liability for the debts and obligations of that concern.

In the first week of May, I listened to able and exhaustive arguments on the part of the attorneys, both for the petitioning creditors and the respondents, and have since given close attention to learned briefs submitted by them. I may say no case has ever been more thoroughly developed before me either in oral argument or by printed brief. There were involved so many questions demanding investigation preliminary to the conclusions reached that I will not undertake to set forth in extenso the reasons upon which I rest the decision of the case, nor to review conflicting authorities. To do so would be a wearisome elaboration. I will not do more than discuss the points deemed by me to be vital and controlling.

1. On April 11, 1873, the Legislature of the state of Texas, by special act, granted a charter to the City Bank of Sherman. This charter included more than one purpose as the object of incorporation. It vested the corporation with banking privileges as well as with certain trading privileges. It is admitted by petitioning creditors that the charter thus granted was duly accepted and acted upon by the incorporators, and that in pursuance thereof the City Bank of Sherman was created and established at Sherman, Tex. Those who in 1902 were instrumental in promoting and establishing the Western Bank & Trust Company, as such, in the banking business at Dallas, had for that purpose theretofore secured control of the charter and rights of the City Bank of Sherman by purchase of nearly the whole of the outstanding shares of its capital stock. To change the name and location of the bank it became necessary to amend its charter. There was no warrant of authority for such amendment unless it could be found in the general laws of Texas. Resort was had to the provisions of article 647 of title 21 of the Revised Statutes of Texas of 1895, relating to corporations.

Under the provisions of section 19 of the final title of the Revised Statutes of 1879 (page 719), as well as under the provisions of the same section and title of the Revised Statutes of 1895, it is necessary to construe article 647 as a continuation of section 10 of article 2 of the incorporation act of 1874 (Laws 1874, p. 122, c. 97). Article 647 differs somewhat in phraseology from that part of section 10 of the original act now incorporated in article 647. As the language used in the original section 10 is controlling, I quote that part of it now covered by article 647:

"Any corporation organized under the provisions of this act, or any private corporation or company incorporated by special act of the Legislature, which said company or corporation would have been authorized to incorporate it-

self under the provisions of this act, any such company or association or corporation may amend or change their articles of incorporation in the same manner that this act requires for the original organization of a body corporate, to-wit: By filing, authenticated, as by this act required, the amendments or changes to the original charter with the Secretary of State; and in case of a corporation created by special act of the Legislature, said corporation shall cause the changes or amendments to their charter to be authenticated as required by this act, and filed with the Secretary of State, together with their original charter, or such amendments as have been made by special act; which shall be recorded by the Secretary of State, followed by the proposed changes or amendments to same; such changes or amendments shall take effect and be in force from the date of filing with the Secretary of State."

Under the construction given the incorporation act of 1874 by the Supreme Court of Texas, a corporation could not incorporate thereunder for two or more distinct purposes; such purposes being designated in different subdivisions of the article specifying the various purposes for which incorporations may be organized. Ramsey v. Tod, 95 Tex. 614, 69 S. W. 133, 93 Am. St. Rep. 875. In my opinion section 10, when construed alone, extends the right to amend only to a corporation incorporated by special act of the Legislature which would have been authorized to incorporate itself under the provisions of the act of 1874. It follows that in 1902 article 647 extended the right to amend only to a corporation incorporated by special act of the Legislature which would have been authorized to incorporate itself under the provisions of title 21 as they then existed. As above stated, the City Bank of Sherman was incorporated for more than one purpose; its charter conferring certain trading privileges as well as banking privileges. In the year 1902 it could not have incorporated under this title with banking privileges, nor could it even have incorporated thereunder for two legitimate and specific purposes, if the same were designated in different subdivisions of article 642. It was therefore not privileged to avail itself of article 647 for the purpose of amendment, unless through some additional provision of the law the privilege of amendment accorded certain corporations by article 647 was extended so as to include it. Article 664 of title 21 of the Revised Statutes of 1895 is as follows:

"Art. 664. Any corporation heretofore organized and now in existence under any general or special law of the republic or state of Texas may, by a vote of its board of directors, accept any or all of the provisions of this title, and have and exercise all of the rights, power and privileges conferred by this title, by filing a copy of their acceptance with the Secretary of State; whereupon that portion of its charter inconsistent with this title, or the portion accepted, shall cease to be applicable to such corporation; and it shall have the exclusive right to carry out the objects of said corporation, as described in its act of incorporation, or certificate, filed with the Secretary of State, if acting under a general law within the limits or boundaries described in said act of incorporation, or certificate, as the case may be, without any limitation as to time, and shall possess all the privileges and franchises conferred by its act of incorporation or certificate filed with the Secretary of State, not abandoned in the copy of acceptance of any or all of the provisions of this title."

The above article is the same as section 22 of the incorporation act of 1874, and has been carried forward through the revisions of the statutes in the identical language in which it was originally passed.

Article 647 of the title unquestionably provided for the amendment of corporate charters, and the right to amend was one of the privileges conferred by the title. A fair construction of the language of 664 "extends this privilege to any corporation heretofore organized and now in existence under any general or special law of the republic or state of Texas" upon compliance with its terms and upon conditions stated. The City Bank of Sherman was such a corporation, and therefore upon compliance with the terms and conditions of article 664 it would have been permitted to amend its charter under article 647.

All the requisite and necessary steps were taken under article 647 to change the name of the bank from "City Bank of Sherman" to "Western Bank & Trust Company," and to change its home office from Sherman, Tex., to Dallas, Tex. None of the steps prescribed in article 664 as necessary to avail the corporation of the privileges therein conferred was taken. There was no vote of the board of directors by which "any or all of the provisions of the title" were accept-ed. Consequently there was no copy of acceptance filed with the Secretary of State.

It is admitted by petitioning creditors that at the time action was taken looking to the amendment of the charter, which was on October 7, 1902, the charter of the City Bank of Sherman was valid and subsisting. It is also admitted that the amendment whereby the name and domicile were changed was a valid amendment. But it is contended that the amendment could not be legally had under the provisions of article 647, and therefore must impliedly be held to have been had under or through the provisions of article 664; that thereby the cor-poration availed itself of a privilege conferred by title 21 and must be held impliedly to have assented to and accepted the consequences flowing therefrom, one of which it is contended was the striking down of its banking privileges.

The charter of the City Bank of Sherman granted in 1873 constituted a contract between the state and the bank, and it was not within the power of the state to revoke any of the provisions thereof. Const. U. S. art. 1, § 10; Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629. It would have been entirely competent and proper for the state through legislative enactment to extend to a corporation an offer to alter, modify, or enlarge its corporate privileges upon sur-render by it of its banking privileges. To have accepted such an offer would have resulted in such surrender. Counsel for petitioning credit-ors contend that this is what was done by the bank in amending its charter by changing its name and domicile; that this was the effect of article 664 above quoted. The section now appearing as article 664 of title 21 of the Revised Statutes of 1895 was included in the incorporation act of 1874, and has ever since been embodied in the law of the state relating to corporations. So far as I am advised, this article has never been construed and its effect determined by a court of controlling authority of this state. The article may be construed to be an offer to certain specified classes of corporations permitting them by the taking of prescribed steps to accept any or all of the pro-visions of the title relating to corporations, and to have and exercise all the rights, powers, and privileges conferred by the title. The consid-

eration exacted and the condition imposed upon the accepting corporation are as follows:

"Whereupon that portion of its charter inconsistent with this title, or the portion accepted, shall cease to be applicable to such corporation."

Had this clause not contained the phrase, "or the portion accepted," it would have been easy to ascertain and declare the intention of the Legislature in this regard. With the phrase included, its intention is somewhat uncertain and ambiguous. But in construing a statute, if it is possible, effect should be given to every word and phrase thereof, unless so doing leads to an absurdity. This is a well-recognized and accepted canon of construction, and in its application here effort should be made to ascertain the meaning of and give effect to this phrase.

Descending to a somewhat critical analysis of the first part of the article under consideration, it will be observed that specified corporations are extended the invitation to accept 'any or all of the provisions of this title, * * * whereupon that portion of its charter inconsistent with this title, or the portion accepted, shall cease to be applicable to such corporation." Are the conditions imposed upon a corporation accepting any or less than all of the provisions of the title identical with or different from those imposed upon a corporation accepting all the provisions of the title? The answer must be gathered from the context of the article wherein the conditions are imposed. Having extended the invitation to a corporation to accept all the provisions of the title, it would seem at least logical and consistent that the Legislature should impose as a condition of such acceptance that any portion of the charter inconsistent with the title should cease to be applicable to the corporation accepting all of the title. Having also extended the invitation to accept any (or less than all) of the provisions of the title, the Legislature might with propriety and of right have imposed the same condition as that imposed for accepting all the provisions of the title This is what was done by the Ohio law upon the construction of which by the Supreme Court of that state counsel for petitioning creditors so largely rely. Cincinnati, H. & D. R. Co. v Cole, 29 Ohio St. 126, 23 Am. Rep. 729.

It could also have imposed another and different and less comprehensive condition. "Or inconsistent with the portion accepted" are apt and appropriate words for expressing such modified condition. If an amendment to a charter were inconsistent with the portion of the title accepted, it would of necessity be inconsistent with the title, and there would have been no need to use the phrase "or the portion accepted" in event it was the intention of the Legislature to render inapplicable every portion of the corporation's charter in any wise inconsistent with the entire title upon the acceptance by it of less than all of the provisions thereof. Giving effect to this phrase, read in connection with the preceding portion of the article, it would appear the Legislature contemplated and intended that the corporation accepting some one or more, but not all of the provisions of the title, would thereby render only that portion of its charter inapplicable **which was inconsistent with the provisions of the title accepted.**

I will not undertake to analyze all of the remaining provisions of this article. It is sufficient to say they reveal added reasons to support the correctness and soundness of the above construction. This is true save in the following particular: It is provided that a corporation availing itself of article 664 and complying with its provisions, among other privileges enjoyed, "shall have the exclusive right to carry out the objects of such corporation as described in its act of incorporation, or certificate filed with the Secretary of State, if acting under a general law within the limits or boundaries described by said act of incorporation or certificate, as the case may be, without any limitation as to time."

Article 651, Rev. St. 1895 (Acts 1883, p. 98, c. 95), gives to a private corporation the right of succession by its corporate name for the period limited in its charter not to exceed 50 years, and, when no period is limited, for 20 years. This is one of the provisions of the same title in which article 664 appears. Section 11 of article 3 of the incorporation act of 1874 gives the right of succession for a period of 20 years. What is now article 664 of the Revised Statutes of 1895 is a literal continuation of section 22 of the incorporation act of 1874. If the phrase "without any limitation as to time" gives expression to the true legislative intent, then the right of indefinite and everlasting succession was given those corporations availing themselves of article 664, while the corporations coming into existence under the provisions of this very act of incorporation were granted life and succession for but 20 years.

Nowhere in the general incorporation laws, save in this phrase, is there manifest any disposition or intention to bestow on corporations everlasting succession. On the other hand, there is manifest a disposition and intention to, and there is placed upon them a definite limitation as to time of succession. I should be slow to hold that these two provisions as to time were to be construed in pari materia and both given effect; but in my view it is not necessary to determine this question. Under what I have concluded to be a proper construction of article 664, the City Bank of Sherman would not, as a condition of accepting the privilege of amendment under article 647, be compelled to abandon that portion of its charter inconsistent with the title, but only such portion thereof as was inconsistent with the portions accepted. This being true, if it was entitled to amend thereunder, it could partake of the privileges conferred that were lawful for it to partake of, but could not partake of a corporate life of a longer duration than was granted by the terms of its charter. This was denied it by the Constitution and the law.

- Contemplating article 664 as a whole, and taking into consideration the time at which its substance was incorporated into our law, I am of the opinion its main purpose was not to whip into line or eliminate corporations possessing objectionable privileges and powers, but rather to afford a method by which existing corporations could avail themselves of the rights, powers, and privileges granted by the terms of the incorporation act. It was, of course, sought to bring these corporations into harmony with the laws of the state as such laws then existed, but it was sought to do this only in the limited way in-

dicated in the above construction. It can be said with positiveness that the Legislature in the year 1874 did not have in view the elimination of corporations possessing banking privileges, as the very act of which the identical language of article 664 was a part permitted the incorporation of such banks.

From the foregoing it follows: (1) That there existed in the general laws of Texas authority for the amendment of the charter of the City Bank of Sherman in the particulars it was sought to be amended; (2) that there was an effort made to amend thereunder; (3) that, according to the contention of counsel for the petitioning creditors, it will be held to have accepted the provisions of the law it did not literally comply with. Therefore, after the amendment changing name and domicile, the Western Bank & Trust Company, having transacted business as a corporation, was, in contemplation of law, a de facto corporation. Tulare Irrigation District v. Shepard, 185 U. S. 13, 22 Sup. Ct. 531, 46 L. Ed. 773; American Salt Company v. Heidenheimer, 80 Tex. 344, 15 S. W. 1038, 26 Am. St. Rep. 743.

While I have entertained a construction of article 664 which does not result in the necessity of an abandonment by the City Bank of Sherman of "that portion of its charter inconsistent with this title," yet in view of the somewhat ambiguous and confusing phraseology of this article perhaps it would be relevant and pertinent to consider whether any portion of the corporation's charter is inconsistent or logically incompatible with any of the provisions of the title which would place in jeopardy its life as a corporation with banking privileges. There may be portions of the charter inconsistent with provisions of the title, the effect of which, if applicable, would have been to alter or modify some of the privileges; but of these I am not treating. Intervening between the time of the granting of the charter to the City Bank of Sherman and the time of the amendment in 1902, the laws of the state of Texas relating to private corporations with banking privileges had undergone marked changes. Section 16, art. 16, of the Constitution adopted in 1876, provides:

"No corporate body shall hereafter be created, renewed or extended with banking or discounting privileges."

The twenty-eighth specification of article 566, which specified the various purposes for which corporations might be formed, was incorporated in article 566 by act of March 23, 1887 (Laws 1887, p. 41, c. 58), and was as follows:

"The accumulation and loaning of money; but this subdivision shall not permit incorporations with banking or discounting privileges."

This specification, in substantially the same form, with a change of its number and number of the article in which it appeared, was continued in effect down to and including the time at which the City Bank of Sherman sought to amend its charter.

Article 649 of the Revised Statutes of 1895 is as follows:

"No amendment or changes violative of the Constitution or laws of this state, or of any of the provisions of this title, shall be of any force or effect; and no amendments or changes shall be of any force or effect which are not

germane to the original purpose or charter of incorporation, and calculated to carry out and effect the same."

It will be observed that the constitutional inhibition covers the creation, renewal, and extension of corporations with banking privileges. The statutory inhibition, read in the light of the context in which it appears, covers simply the creation of corporations. It was therefore the public policy of this state, as revealed in its fundamental law and its statutes, not to create, renew, or extend any private corporations with banking privileges. At the same time, it was the policy of the state as revealed in section 7, art. 12, of the Constitution, not to "divest or affect the rights guaranteed by any grant or statute of this state, or of the republic of Texas."

This provision places the Constitution of Texas in accord with the Constitution of the United States on this subject. It is certain that by amending the charter of the City Bank of Sherman in the matter of name and domicile its banking privileges were neither created nor renewed. Were they extended? "To extend," as used in this connection, would mean to make more comprehensive; to enlarge the scope of or give a wider range to. There cannot be said to be any extension of banking privileges involved in the change of name. There is some question as to the effect of the change of domicile. This might be considered as an enlarging of scope and widening of range; but the City Bank of Sherman in its original charter, without amendment, could have conducted a banking business at Dallas. Section 9 of the charter provides:

"It shall be lawful for such corporation to establish such and so many branch offices in this state and in such localities therein and with powers to exercise such of its rights and privileges, * * * as its directors shall from time to time provide."

In view of this very general grant of power to do a banking business in any part of the state, I cannot conclude there was any substantial extension of privilege involved in the change of the location of its main office from Sherman to Dallas. At most, the extension was not of that character which would justify a court in decreeing that because of it and because of the amendment authorizing it the Constitution and law had been violated, and the corporation as a banking concern consequently disincorporated and stricken down.

2. The City Bank of Sherman having changed its name to "Western Bank & Trust Company," all corporate acts were thereafter performed under the latter name, but in virtue of the authority granted in the original charter of the City Bank of Sherman. With relation to capital stock its charter, among other things, provided that:

"The capital stock of said corporation shall be $200,000, in shares of $100 each, but the same may be increased from time to time by a vote of the majority in interest of the stockholders of the said corporation voting in person or by proxy at any meeting duly held. Provided, that the capital stock of said corporation shall never exceed $500,000."

On October 18, 1902, at a regularly called meeting of the stockholders, a resolution was unanimously passed increasing the capital stock of the corporation from $200,000 to $500,000 in shares of $100

each. Thereafter, on the same day, the board of directors took the necessary steps looking to the subscription for and issuance of this stock. All the original shares of stock of the City Bank of Sherman were retired, and there were issued in their stead the shares of the capital stock of the Western Bank & Trust Company; a small allowance being made on the price of the new shares for the ascertained value of the old. There intervened a short period between the retirement of the old issue and the issue of the new.

Petitioning creditors complain that this left the Western Bank & Trust Company without stockholders, and they contend a corporation cannot exist without stockholders. The City Bank of Sherman as a corporation was brought into existence by the granting of its charter. Its charter was a franchise right to be exercised by those entitled under the law to exercise it. It existed before there were stockholders, so that its existence does not depend upon the existence of technical stockholders. This view is supported in Jefferson · v. Texas Investment Company, 74 Tex. 421, 12 S. W. 101; Rio Grande Cattle Company v. Burns, 82 Tex. 50, 17 S. W. 1043. In any event, I am of the opinion that, if there were irregularities in the manner of retirement of the old and the issue of the new stock, the state alone would have the right to complain.

3. There remains but one question for consideration, that of estoppel. Aside from the question of the existence or nonexistence of the Western Bank & Trust Company as a de facto corporation, there is a question here as to whether, because of previous conduct inconsistent therewith, petitioning creditors are not now precluded from asserting that it is not a corporation. The Western Bank & Trust Company opened its doors in the city of Dallas to do a banking business on February 2, 1903, and continuously conducted such business until its doors were closed on January 15, 1908. With the advice of counsel as to each step necessary to the legitimate accomplishment of that end, the concern was founded upon the charter of the City Bank of Sherman. According to the uncontroverted evidence before me, its capital stock of $500,000 was fully paid in. Regular annual meetings of its stockholders were held, at which directors were elected, and the directors in turn elected from their number the officers of the corporation. By-laws were adopted, and the minutes of the stockholders and directors' meetings were kept. A corporate seal was kept, and, where appropriate, corporate acts were attested therewith. No other conclusion can be reached from the testimony in the record before me than that there was a genuine and bona fide effort to legally establish the Western Bank & Trust Company as a banking corporation, with a paid-in capital of $500,000, and that there existed a genuine and bona fide belief on the part of those who promoted the concern that they had in fact accomplished this result. In other words, there existed no fraudulent intent on the part of those promoting the concern, in its establishment in the banking business in Dallas, as a corporation. They were seeking to establish a legitimate corporation and thought they had done so.

163 F.—46

From the time the concern opened its doors it made prominent in every phase of its business that it was a banking corporation, organized under special act of the Legislature of Texas. In all places and at all times it held itself out as and represented that it was such a corporation. It is admitted by petitioning creditors in the broadest terms that notice of such holding out was brought home to them in their dealings with it. Depositors placed their accumulated earnings and savings with it on the theory that it was a banking corporation. Those who entered into contracts with it contracted with it as a corporation, and they did not suppose they were contracting with the individuals who comprised its stockholders. The responsibility of the corporation was accepted and relied upon, and not the individual responsibility of its membership. Under this state of facts I do not consider there is the least doubt as to what the decided weight of authority declares the law to be.

Clark and Marshall, in their treatise on Private Corporations (volume 1, p. 182), say:

"By weight of authority, if an association assumes to act as a corporation, even without any authority at all from the Legislature, a person who recognizes its existence as a corporation by contracting or otherwise dealing with it as such is estopped to deny it is a corporation in an action based upon such contract or dealing, whether the action is brought by the association as a corporation against him, or by him against the association to charge them as partners. In such cases the estoppel renders it unnecessary, according to the weight of authority, to prove either a de jure or a de facto corporate existence. It is only necessary to prove that the association was acting as a corporation, and that it dealt or was dealt with as such."

Among the list of authorities cited by the authors in support of these propositions is the case of Gartside Coal Company v. Maxwell (C. C.) 22 Fed. 197. In the course of that opinion, delivered by Judge Brewer, now of the Supreme Court, the following language is used:

"So, on the other hand, where a person deals with what he supposes is a corporation, with what all parties think is a corporation, where he gives his credit to that supposed corporation, he cannot afterward, when it turns out that it is not validly incorporated, turn round and say: 'Well, I dealt with this supposed corporation. I thought it was a corporation. I trusted it as a corporation. I sold goods to it as a corporation. But it seems when it first attempted to become incorporated that there was some defect or irregularity in its proceedings, so that it did not become legally incorporated, and therefore you who are stockholders will be held personally liable.' I don't think it can be done."

Even though the Western Bank & Trust Company were not a de facto corporation, I am of the opinion petitioning creditors could not now be permitted to say: "It is not a corporation, and therefore you who are stockholders must assume a personal liability to us."

I have stated there existed no fraudulent intent in the establishment of the concern as a corporation in the banking business at Dallas. When I say this, I do not wish to be understood as speaking of the subsequent conduct of its business. The management of the affairs of the bank may have been characterized by a hurtful disregard of sound and honest banking principles. Hopeless and disastrous insolvency may have followed in the wake of such management as its inevitable consequence. But this proceeding is not brought to fix a

personal liability upon any person guilty of mismanagement of the affairs of the bank. As has been made plain, such mismanagement is not the basis of the proceeding. It is sought here to fix upon every holder of shares of the concern's stock the liability of a partner, a liability to the creditors of the concern for the whole amount of every debt due therefrom, without reference to his interest, as that interest may be represented by the number of shares owned. The record discloses: That among its stockholders are many persons living in various parts of the United States who purchased their shares of stock after the organization had been effected; that they paid par or more than par therefor as an investment in a banking corporation; that they believed a legal corporation existed; that otherwise they would not have made the investment; that they received such dividends as the board of directors declared; that a large majority of them knew absolutely nothing of the conduct of the business of the concern; and that, if wrong was done, they were entirely and absolutely innocent of knowledge thereof.

In the case of Fay v. Noble, 7 Cush. (Mass.) 192, the court says:

"We are not aware of any authority, certainly none was cited at the argument, to warrant the instruction that, in consequence of an omission to comply with the requisitions of law in the organization of a corporation, by which its proceedings were rendered void, persons who had subscribed for and taken stock in the company thereby became partners. The doctrine seems to us to be quite novel and somewhat startling. Surely it cannot be, in the absence of all fraudulent intent (and none was proved or alleged in this case), that such a legal result follows as to fasten on parties involuntarily for such a cause the enlarged liability of copartners, a liability neither contemplated nor assented to by them. The very statement of the proposition carries with it a sufficient refutation. No such rule can follow, unless a principle of law be established, founded on no authority, and required by no public exigency. Corporations are known and recognized as legal entities, with rights and powers clearly defined and well understood. and wholly distinct and different from those of individuals and copartnerships. Persons who subscribe for and take stock in them are subject to certain fixed and limited liabilities, which they voluntarily assume, and these liabilities are not to be extended and enlarged, so as to affect innocent parties, beyond the letter of the law. A copartnership cannot take upon itself the functions of a corporation, nor can a corporation or its members be made subject to the liabilities of a copartnership, in the absence of all statutory provisions imposing such liabilities. The personal liability of the members of a joint stock company or copartnership is inconsistent with the character and nature of a corporation, of which the law properly recognizes only the creature of the charter, and knows not the individuals." Ang. & Ames on Corp. 536, 537.

In the case of American Salt Company v. Heidenheimer, 80 Tex. 344, 15 S. W. 1038, 26 Am. St. Rep. 743, wherein it was sought to hold stockholders in a faultily organized corporation liable as partners, Associate Justice Gaines, speaking for the court, says:

"Whether that rule ought to be applied in a case in which the corporators have knowingly and intentionally violated the law in procuring a charter under a general law we need not decide, but we are clearly of the opinion that it is not a proper rule to be applied in a case like the present, in which it appears that stockholders who are sought to be held liable as partners bought their stock after the organization had been effected and under the belief that a legal corporation existed. That under such circumstances the stockholders of the alleged corporation cannot be held liable as partners is substantially held in the following cases: Bank v. Stone, 38 Mich. 779; Fay v. Noble, 7

Cush. (Mass.) 188; Bank v. Padgett, 69 Ga. 164; Humphreys v. Morney, 5 Colo. 282; Central Bank v. Walker, 66 N. Y. 424; Coal Co. v. Maxwell (C. C.) 22 Fed. 197; Methodist Church v. Pickett, 19 N. Y. 482."

In my judgment it would be harsh and unjust to declare stockholders who became such after the concern was organized, who had nothing whatever to do with the management of its affairs, who were absolutely innocent of any wrongdoing in relation thereto, to be partners in the concern and to decree them personally liable for all its obligations, and this simply because they were stockholders and had accepted the dividends declared on their stock. The immediate and inevitable consequence of such a holding here would be to inflict ruin upon those who have not deserved it. The creditors of the concern bid fair to suffer loss, but a court of justice should not right their wrong by the commission of another wrong still more grievous.

After careful consideration, I have reached the conclusion that the petitioning creditors must fail in their contentions on two grounds: First, the Western Bank & Trust Company is a de facto corporation; and, second, even were this not so, the petitioning creditors by their course of dealing with it as such are now estopped to deny that it is a corporation.

The prayer of the petitioning creditors and of the intervening petitioners will be denied, and their petitions dismissed, at their cost.